UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON, KENTUCKY

```
UNITED STATES OF AMERICA,        ) Lexington Criminal
                                 ) Action No. 17-30
        Plaintiff,               )
                                 ) At Lexington, Kentucky
-vs-                             )
                                 )
GENE PAUL PENDYGRAFT,            ) July 27, 2018
                                 ) 10:00 a.m.
        Defendant.               )
```

TRANSCRIPT OF SENTENCING HEARING PROCEEDINGS
BEFORE THE HONORABLE DANNY C. REEVES
UNITED STATES DISTRICT JUDGE

Appearances of Counsel:

On behalf of Plaintiff:     DAVID A. MARYE, ESQ.
                            Assistant U.S. Attorney
                            260 West Vine Street
                            Suite 300
                            Lexington, Kentucky  40507

On behalf of Defendant:     THOMAS C. LYONS, ESQ.
                            201 West Short Street
                            Suite 800
                            Lexington, Kentucky  40507

Court Reporter:             PEGGY W. WEBER, RPR
                            Official Court Reporter
                            U.S. District Court
                            P.O. Box 362
                            Lexington, Kentucky  40588
                            (859) 421-0814

Proceedings recorded by mechanical stenography,
transcript produced by computer.

```
 1        (Whereupon, the Sentencing Hearing proceedings

 2   commenced on Friday, July 27, 2018, at 10:00 a.m., on the

 3   record in open court, as follows.)

 4             THE COURT:  Thank you.

 5             Madam Clerk, if you would call the matter

 6   scheduled for 10 o'clock.

 7             THE CLERK:  Yes, Your Honor.

 8             Lexington Criminal Action Number 17-30,

 9   United States of America versus Gene Paul Pendygraft,

10   called for sentencing.

11             THE COURT:  Thank you.

12             If counsel would state their appearances,

13   please.

14             Mr. Marye, good morning.

15             MR. MARYE:  Yes, Your Honor, good morning.

16             David Marye on behalf of the United States.

17             THE COURT:  Thank you.

18             Mr. Lyons.

19             MR. LYONS:  Good morning, Your Honor.

20             Thomas Lyons appearing on behalf of

21   Mr. Pendygraft who is present in the courtroom and seated

22   to my left, Your Honor.

23             THE COURT:  All right.  All right.  Thank you.

24             This matter is scheduled for a sentencing

25   hearing this morning.
```

```
 1            Before we proceed with the hearing, let me
 2   first confirm that Mr. Pendygraft has had the opportunity
 3   to review his presentence report and also to discuss it
 4   with his attorney to his satisfaction.
 5            Is that correct, Mr. Pendygraft?
 6            DEFENDANT PENDYGRAFT:  Yes, sir.
 7            THE COURT:  Your presentence report will be
 8   filed in the record under seal.  It's not available for
 9   the general public to review pursuant to Rule 32 of the
10   Federal Rules of Criminal Procedure.
11            There are objections to the presentence report
12   that would affect the guideline calculations, so we will
13   turn to those initially.
14            Mr. Lyons.
15            MR. LYONS:  Your Honor please, there were two
16   objections that I had originally filed by way of letter
17   to the United States Probation Office.
18            The first concerned an enhancement of five
19   levels for distribution associated with non-pecuniary
20   gain.  I filed that in connection with reviewing reports,
21   particularly the text messages that were exchanged
22   between Mr. Pendygraft and this gentleman in Michigan who
23   goes by the moniker Alkislayer.
24            There was not any real indication in those text
25   messages that Mr. Pendygraft was exchanging child
```

1  pornography with this gentleman for the purposes of

2  receiving it in return.

3          However, after reviewing the statement, the

4  recorded statement, that was made by police at the time

5  of these arrests on November 29th, I don't think I can

6  legitimately maintain that objection.  It does appear

7  that there was some trading going on.  He acknowledged

8  that he was sending and receiving these things with the

9  expectation that he would receive back what he was

10 sending.

11         So that's a huge jump in the guideline

12 calculation, and I would like to maintain the objection

13 just for his purposes, but I don't think I can

14 legitimately do that based on the controlling

15 Sixth Circuit case law that I've read.

16         Having said that, the other objection refers to

17 the application of 5G1.3.  As the Court is aware, at the

18 time of his arrest on these child pornography charges on

19 November 29th, he also had a weapon in his possession.

20 I'll get into the reasons why he had that weapon in his

21 possession in a bit.  But the short version is he was

22 planning on committing suicide.

23         That crime was discovered at the time of the

24 discovery of the possession of the child pornography, on

25 the exact same day, on the exact same location.

1          Mr. Pendygraft was prosecuted for that crime

2   in the Boyle Circuit Court.  That's referenced in

3   paragraphs 29 and 34 of the presentence report, and

4   received a three-year sentence of imprisonment, which he

5   is currently serving.  It was an undischarged term of

6   imprisonment within the meaning of 5G1.3.

7          The only question at this point, Judge, is is

8   that relevant conduct to the conduct of conviction, and

9   my position is that it is.

10          The probation office has taken the position

11   that it is not.  However, they have not provided any

12   reason why that is not relevant conduct.  They simply

13   have said it's not relevant conduct.  They did not cite

14   to 1B1.3, and so I don't have any rational basis saying

15   that this is not relevant conduct.

16          The United States has taken a slightly

17   different tact.  Their position is it's relevant because

18   if they had included it within the indictment, I would

19   have asked the Court for a severance of counts at the

20   time of trial.  And, therefore, I would likely be

21   successful in arguing that it shouldn't come into a

22   trial.  That's well and good.  It's just not on point

23   with whether or not it's relevant conduct under 1B1.3.

24          As I read 1B1.3, it encompasses all acts

25   committed by the defendant at the time of the occurrence

1    of the other offense for which he is being prosecuted,

2    and clearly that is the case.

3            You know, most of the case law, Judge, just

4    deals with jointly undertaking criminal activity on the

5    second half of that.  So there's not a ton of cases out

6    there.

7            I did find one case that talked -- and some

8    cases from out of jurisdiction that talked about

9    avoidance of detection, which is another section of

10   1B1.3.

11           So I think there are really two bases for

12   making a factual finding that this is relevant conduct.

13   One is that it is an act that occurred at the time of the

14   commission of the offense of conviction.

15           And the second is that if the purpose of

16   Mr. Pendygraft having a weapon in the house was to kill

17   himself, obviously, he would be avoiding detection,

18   avoiding responsibility for the crime for which he was

19   convicted.

20           THE COURT:  If -- if the motivation was the

21   underlying crime rather than for some other reason, say

22   he was depressed or --

23           MR. LYONS:  Yeah, Judge, and I guess -- and I

24   thought about that.  You know, I can't honestly sit here

25   and say the only reason he had that weapon was because he

1   knew he was going to look at child pornography and,

2   therefore, was going to commit suicide.  I'm not going to

3   make that statement to the Court, because I don't think

4   the evidence necessarily supports it.

5           But I do believe that that was part of the

6   equation, and I certainly believe that this was an act

7   that occurred at the time of the occurrence.

8           Now, I guess, it looked -- it sounded like I

9   faulted the United States for not including that count in

10  the indictment, and Mr. Marye seems to take the position

11  that he doesn't normally do that.  It's not unusual for a

12  felon in possession count to be joined with other counts,

13  even if it's only tangentially related to the, you know,

14  the narcotics offense or some other offense.

15          But I'm not sure how the Court makes a finding

16  that it is non-relevant conduct based on the definitions

17  in 1B1.3, and I have not heard an alternative from either

18  the United States or the U.S. Probation office that would

19  justify finding that this is non-relevant.  It's pretty

20  rare for me to argue that conduct that is otherwise

21  criminal is not -- is relevant conduct.  I'm usually

22  fighting the other direction.

23          THE COURT:  Yes, sir.

24          MR. LYONS:  So that's the argument.  And if

25  that's the case, if the Court does make a factual finding

1    that this is relevant conduct, 5G1.3 applies, and my

2    request to the Court in connection with that is that

3    because he is here on a writ and because the Bureau of

4    Prisons has policy statements, and I've cited those to

5    the Court in my memorandum, because the Bureau of Prisons

6    does not give credit for defendants on their federal

7    sentence when they are serving a state sentence, and they

8    are in federal custody pursuant to a writ, he simply will

9    not get credit for that sentence in terms of the amount

10   of time he has actually been in federal custody awaiting

11   disposition of these charges.  And it's been almost a

12   year at this point, Judge, and some of that's due to the

13   psychological examination that occurred.

14           THE COURT:  If -- even if I find that this is

15   not relevant conduct, that does not preclude you from

16   arguing that the Court should still run the sentence

17   concurrent with the state sentence that's been imposed.

18           MR. LYONS:  Yes.  I believe the Court has

19   plenary authority under the case law to make those

20   decisions as to whether to run that sentence concurrent,

21   consecutive, or some combination of those just based on

22   the Court's inherent authority to fashion a sentence

23   that's appropriate under 3553(a).  I think the case law

24   is pretty clear on that, that the Court has the authority

25   to do that, whether you determine it's relevant or not

1  relevant.

2          THE COURT:  All right.  You also seem to make

3  an argument in your sentencing memo, and maybe you want

4  to save this for after we've handled these objections, as

5  to overstated criminal history.  Of course, under the

6  guidelines that wouldn't be available to you because only

7  departures under chapter 5 would be allowed.  So we'll

8  take that up here -- we'll take that up in just a moment.

9          MR. LYONS:  Yes, sir.

10          THE COURT:  All right.  Mr. Marye.

11          MR. MARYE:  Yes, Your Honor.

12          THE COURT:  The first issue -- of course, I

13  originally thought the defendant was withdrawing the

14  objection based on the five-level enhancement.  He's not.

15  He wants to preserve it for appeal, so it will need to be

16  addressed.  That will be the first issue.

17          And the second is whether this conduct would

18  be -- excuse me, whether conduct that resulted in the

19  conviction for possession of a firearm would be relevant

20  conduct under 3B1.1.

21          MR. MARYE:  Yes, sir.  And, Your Honor, I -- I

22  took it that he was withdrawing that first objection, but

23  I think he basically conceded that there was enough in

24  the conversation that the defendant was trading back and

25  forth with the other gentleman.  I don't remember his

 1 │ moniker now.  That that objection could clearly be

 2 │ overruled by the Court --

 3 │            THE COURT:  Based on --

 4 │            MR. MARYE:  -- based on that.

 5 │            THE COURT:  Based on acknowledged facts that

 6 │ there was a --

 7 │            MR. MARYE:  Yes.

 8 │            THE COURT:  -- trading relationship, that there

 9 │ was an intent of --

10 │            MR. MARYE:  Yes, sir.

11 │            THE COURT:  -- providing some images in

12 │ exchange for receiving others, and it was ongoing.

13 │            MR. MARYE:  Yes, sir.

14 │            THE COURT:  And under Sixth Circuit case law,

15 │ that would clearly be sufficient for the five-level

16 │ enhancement to apply here.

17 │            So let's talk about -- and I will overrule the

18 │ objection based upon those undisputed facts and upon

19 │ authority within the Sixth Circuit on that point.

20 │            Let's, if we could, let's turn to 3B1.1,

21 │ relevant conduct.  I guess what we have here is we have

22 │ an individual that possesses a firearm.  The elements of

23 │ that are completely separate and distinct from the

24 │ elements of the conviction for which he is appearing

25 │ before this Court.

1           We don't have any information about whether the

2    gun was -- he was so distraught because of the possession

3    of child pornography that he was going to use the gun to

4    commit an offense to avoid detection, because you don't

5    have any evidence of that.

6           MR. MARYE:  No, sir.  I apologize, Judge.  I

7    had my finger in the book, and then I laid it down, and I

8    lost it for my argument on 1B1.3.

9           Looking forward in 2B for some reason.

10          Okay.  And I guess this basically goes to the

11   way one reads 1B1.3(a)(1), it's all acts, omissions

12   committed, aided, abetted, council, commanded, all of

13   that, willfully caused by the defendant.  If you stop

14   there, then I would agree with him.

15          However, there's an "and," and when you go on

16   subsection (b) is not applicable.  So you go after

17   subsection (b) and it says, and that occurred during the

18   commission of the offense in preparation in the course of

19   attempting to avoid detection or responsibility for that

20   offense.

21          I did not think of the weapon being used in any

22   of those means.  I don't see how in any way it's used

23   during the commission of the offense, since that is, you

24   know, on the Internet.  You can't put the gun on the

25   Internet.  I guess he could have threatened someone to

1  give him child porn, but we have no evidence that he did

2  that.  I don't see how the gun being there is in any way

3  preparing that offense.

4          To me it's a -- and it's sort of an interesting

5  argument that he was going to avoid responsibility by

6  committing suicide.  I guess on one hand that could be if

7  someone commits suicide, they're not going to be

8  prosecuted criminally for the offense.  I doubt that that

9  was really in his mind or any motivation that, well, I'm

10  going to commit suicide because I don't want to go to

11  prison.  It was probably as a result of the depression

12  that is pretty well documented.

13          So I don't -- I just don't see how that would

14  be considered relevant conduct other than if one accepts

15  that argument.  If, in fact, in his mind he was going to

16  commit suicide to avoid responsibility for a criminal

17  offense, I suppose the Court could honor that or accept

18  that.  And if you do, then I think he's probably right,

19  that it could be considered relevant conduct.  I was not

20  certainly thinking in those terms.  Basically my

21  rationale, maybe not particularly a strong legal one, is

22  just that I'm not aware of our district ever doing it.  I

23  asked someone to check on that, and they ran a computer

24  program.

25          Now, obviously, just like any computer program

1  if someone hasn't input it correctly, you know, then

2  you're not going to get the right results.  But the

3  technician told me that based on what she ran there were

4  no cases within this district that we're aware of that

5  involved a felon in possession offense in conjunction

6  with child pornography offenses.

7          And then I agree, of course, obviously, even if

8  you determine that it's not relevant conduct, Judge, you

9  certainly have the authority to run any or all or some

10  portion of that state sentence concurrently with whatever

11  sentence you impose today.

12          THE COURT:  All right.  Well, there are a

13  couple of issues here.  One is lack of proof.  There's no

14  evidence that's been offered for the Court to draw the

15  conclusion, either from direct proof or circumstantial

16  proof, that the defendant was, in fact, possessing a

17  weapon to avoid detection of the conduct that brings him

18  before this Court.

19          Now, I am able to look at the evaluation that

20  was performed by the Bureau of Prisons, ordered by the

21  Court, with regard to the defendant's mental health and

22  mental health issues at the time of this particular

23  matter.  But his mental health issues were not limited

24  to -- wasn't having problems just around the time that he

25  was detected in this particular matter.  He has

1  longstanding mental health issues.

2          And, therefore, the Court can't conclude that

3  he possessed the weapon solely for the purpose of taking

4  his life in connection with this particular offense, or

5  that the two are in any way related.

6          Instead -- and also when I look at the

7  defendant's criminal history, he does have a pattern of

8  disregarding conditions of supervised release, and

9  therefore disregarding obligations that he has.

10         So it would not be unusual for an individual

11 such as the defendant with his -- with his proclivities

12 to possess a weapon knowing that he's not allowed to

13 possess a weapon because he was committing other

14 offenses, including violations of supervision throughout

15 his -- throughout his history, throughout his adult

16 history.

17         And, therefore, there's no sufficient proof for

18 this Court to conclude that these matters are in any way

19 related.

20         And, therefore, I would find under 1B1.3 that

21 this would not constitute relevant conduct, but it would

22 not prevent the defendant from arguing that the Court

23 should run the sentence consecutive or -- excuse me,

24 concurrent or partially concurrent with the undischarged

25 sentence imposed by the state court.

1          So I will -- will overrule both of the stated

2   objections to the presentence report.

3          Earlier I had mentioned to counsel one argument

4   that was made in the sentencing memorandum about

5   overstated criminal history, and under the guidelines, of

6   course, 4A1.3(b) states that if reliable information

7   indicates that the defendant's criminal history category

8   substantially over-represents the seriousness of his

9   criminal history or the likelihood that he will commit

10  other crimes, a downward departure may be warranted.

11         However, with regard to the guideline issue

12  itself, 5K2.2 -- 5K2.0, excuse me, provides a limitation

13  in child crimes and sex offenses, and it specifically

14  provides that only part K of chapter 5 would be sole

15  grounds for departures under the guidelines.

16         And so overstated criminal history would not be

17  a permissible departure reason, but, of course, may be

18  considered under 3553.

19         I will adopt the findings that are contained in

20  the presentence report, as well as the guideline

21  calculations.  I will review those with the parties in

22  just a moment.

23         Before I do that, in addition to adopting the

24  facts set forth, I'll also adopt the additional facts,

25  the parties' agreement with regard to the one objection

1    on the evidence in this particular matter in terms of
2    trading images with the person that's identified by the
3    moniker outlined in the presentence report.
4            Now, the guidelines provide that beginning at
5    paragraph 10 the 2016 edition of the guideline manual is
6    applied.
7            The base offense level in this matter is a
8    level 22.  And most of these enhancements are outlined in
9    the parties' plea agreement, with the exception of the
10   five-level enhancement for distribution under
11   2G2.2(b)(3)(B).
12           So we have a base offense level of 22.  We have
13   a two-level increase based upon the images involving a
14   minor not attaining the age of 12, five-level increase
15   based upon 2G2.2(b)(3)(B), distributed in exchange for
16   any valuable consideration, which under Sixth Circuit
17   authority, would include receiving back in exchange
18   pornographic images that would not be for pecuniary gain.
19           The four-level increase under 2G2.2(b)(4)(A),
20   because the material portrayed sadistic and masochistic
21   conduct, and a two-level increase based upon use of a
22   computer, and a four-level increase based upon number of
23   images, including the videos possessed by the defendant.
24   And that results in an adjusted offense level of 39.
25           The report indicates a three-level reduction

1  for acceptance of responsibility.

2          Mr. Marye, what is the government's position

3  with regard to the third level of acceptance of credit?

4          MR. MARYE:  Your Honor, the United States would

5  move to grant that third level.

6          THE COURT:  All right.  I will sustain the

7  motion.  That has the affect of reducing the total

8  offense level in the case to a level 36.

9          Information regarding the defendant's criminal

10 history is contained in the report.  He has 10 criminal

11 history points that would place him in Criminal History

12 Category V for purposes of calculating the guideline

13 range in the case.  And the guideline range is a range of

14 292 to 365 months.  That's outlined in paragraph 44.

15         The term of supervision would be a range of

16 five years to life.

17         The fine range in the case is a range of 40,000

18 to $250,000.

19         And, again, those are the relevant guideline

20 calculations that have been adopted in the matter.

21         At this time we'll -- I believe there was a

22 motion to -- or there would be a motion to dismiss the

23 remaining Counts 2 and 3.

24         MR. MARYE:  Yes, Your Honor.  I would ask the

25 Court to dismiss Counts 2 and 3 pursuant to the plea

1  agreement.

2          THE COURT:  That motion will be sustained

3  effective upon entry of the judgment in the case.

4          All right.  If there are no other motions to be

5  taken up, other than the motion for a departure or a

6  variance, we'll proceed with allocution.

7          And, Mr. Lyons, you've made several arguments

8  in your sentencing memo, and I believe it is -- it would

9  be helpful to the Court as you review these arguments if

10 you would please indicate whether you're seeking a

11 variance or a departure, because if it is a departure,

12 then we'll need to go back to the guideline manual.

13         MR. LYONS:  May it please the Court.

14         THE COURT:  Yes, sir.

15         MR. LYONS:  I guess preliminary I should say

16 that all of the arguments that I have made are in

17 connection with a motion for variance under 3553(a), and

18 I'm not asking the Court to make a finding about

19 departures going back to the guidelines.

20         THE COURT:  All right.

21         MR. LYONS:  I think we're so used to asking for

22 departure from history that we sometimes just throw that

23 language in indiscriminately, and I apologize for that.

24         Judge, let me just talk a little bit about the

25 history and characteristics of the defendant, and then

1   I'll get to the variance issues in just a minute.

2           Briefly, we have a man that's 46 years old

3   who's before the Court on this child pornography

4   conviction.

5           Acknowledge up front that this is recidivist

6   behavior.  He does have a conviction from 2001.  That was

7   some 15 years ago.  When I looked at the sentence that he

8   received on that particular charge, 27 months, you know,

9   my first instinct is that was a pretty light sentence.

10  I've known Judge Forester for a lot of years, and it

11  doesn't sound like something he would normally do.

12          THE COURT:  Well, it does to me.  I mean, it's

13  the bottom of his guideline range, and that's what

14  Judge Forester always did, was sentence at the bottom of

15  the guideline range.

16          MR. LYONS:  Well, I think -- I think he may

17  have became a bit more -- I guess from a defense

18  perspective, reasonable as time went on, as he became

19  older.  But I certainly have seen him put dangerous

20  people in prison.

21          THE COURT:  You know, I've gone back and looked

22  at his statistics, as a matter of fact, going back to

23  2005, and Judge Forester varied below the guidelines more

24  than any other Judge in this district since that time.

25          MR. LYONS:  Well, it could have been good

20

1    defense lawyering --

2              THE COURT:  Could be.

3              MR. LYONS:  -- I suppose.

4              THE COURT:  Could be.

5              MR. LYONS:  Having said that, Judge, you know,

6    the picture that we have of this guy is a guy who was ill

7    in a lot of different ways.  You know, he's going along,

8    he's married to this woman, this is his entire life.  He

9    does have two children.  You know, one is just entering

10   college, and the other one is 12 years old.

11             Every time I've met with Mr. Pendygraft,

12   remorse is written all over him.  He's, frankly, pitiful

13   in so many respects.

14             So in 2013 he gets a divorce from this woman

15   who is his whole world.

16             Shortly thereafter, she remarries.  From his

17   perspective throwing a little sand in his face.

18             THE COURT:  Was the divorce in '13 or in 2016?

19   Because I was looking at the mental health evaluation,

20   and it indicated, I believe, 2016.

21             DEFENDANT PENDYGRAFT:  2016, sir.

22             THE COURT:  All right.

23             MR. LYONS:  Okay.  Well, maybe it was, but I

24   think at that point the --

25             THE COURT:  May have been a separation prior.

1            MR. LYONS:  -- relationship had been ruptured.
2    And so he's living in a little outbuilding out behind the
3    house, basically like a hermit, unemployed, depressed,
4    suicidal.  You know, he's got a long history of major
5    depressive disorder, social anxiety, very unusual client
6    who literally won't come out of the -- come out of the
7    cell.  Doesn't interact with other people.  He's
8    extremely awkward and fearful, terrified that somebody in
9    the cell is going to read the reports, and I've had to
10   really be careful about what I send and what I don't send
11   to Mr. Pendygraft because of the fear reprisal.

12           And he falls apart.  He just falls apart after
13   the divorce.  You know, at that point he had, according
14   to him, not been looking at child pornography for a
15   significant number of years, doesn't appear to have been
16   engaged in a whole lot of criminal behavior.

17           He does have criminal history, and I guess
18   maybe I'll talk about that now for a second.  At around
19   the time when this divorce is going on or when his
20   rupture of this relationship is going on, he picks up
21   these two charges in 2013 and 2014, both of which are,
22   you know, they do reflect failure to comply with the law,
23   and they do -- they're legitimate convictions,
24   Your Honor.

25           But as I -- as I look at them and as I've dealt

1   with other child pornography people and people on sex
2   offender registration, basically these are violations of,
3   I guess, my Latin used to say mala prohibitum rather than
4   mala per se.  That is that they're bad because they are
5   prohibited.  You know, he's on -- he got on Facebook
6   apparently and sustained a conviction.  And another one
7   involved a change of address, and so he's getting
8   significant criminal history points here for I don't want
9   to just call them technical violations because that sort
10  of belittles the fact they are illegal, but they
11  certainly are not conduct that is at least consistent
12  with his 2001 conviction.  They're not him actually
13  looking at child pornography.  So it looks like he's gone
14  a long period of time without doing that.
15          And then when his world falls apart, apparently
16  this demon arises back, and he engages in this conduct
17  with this gentleman in Michigan.
18          I think it's important to note that there's no
19  violence in the defendant's background.  There is no
20  indication that he is a pedophile; although, I have to
21  acknowledge that there's a reference in the psychological
22  report of a diagnosis of that.  I'm not sure what that
23  diagnosis is.  You know, I'm not an expert on the DSM.
24  But I think the conclusion was drawn largely because of
25  his 2001 conviction on child pornography, and this

1    current behavior.  But there's no indication in the

2    records, or in the documents I've seen, that he's had any

3    contact with children, that he's tried to touch children,

4    that he's ever been found alone with children, that he

5    has frequented places where children go, or that he

6    actually has any kind of sexually dangerous behavior, to

7    use the phrase from the sentencing commission.

8              THE COURT:  Well, there's -- now, first of all,

9    let me just note that the guidelines are not intended to

10   punish him for molesting children.  Now, that may have --

11   by imposing the sentences in these cases that are

12   imposed, it may have that collateral consequence that may

13   catch people that otherwise may molest children, but

14   they're not intended to do that.  And sometimes there's

15   this false argument that's made that he's -- because he's

16   not a child molester, then he doesn't really fit within

17   the rubric of why he's here before the Court.

18             But when those arguments are made, I think it's

19   important to understand that according to studies -- and

20   one of these studies has been under some attack, but

21   there are studies that have been performed that would

22   indicate that the number -- that the amount of under

23   reporting in these cases is pretty significant.

24             There's an article that was written several

25   years ago by Alexandra Gelber, I think is her name, at

1    Department of Justice.  She's the -- was the head of the

2    Child Exploitation and Obscenity Section.  It was, I

3    believe, a 2009 article, and she refers to an article

4    that was a Butner study from a year earlier by

5    Michael Bourke and Andres Hernandez that have written

6    pretty extensively on these issues.  And they had written

7    an article that basically indicates that the amount of

8    under reporting of individuals that commit these offenses

9    is very significant, and that there is cross-over

10   offenses that take place.

11         In other words, individuals that are convicted

12   of these offenses often not only abuse children of

13   different ages but of different genders as well.  And the

14   number of victims that are reported, the numbers are --

15   we go from in this study 74 percent of the individuals

16   that enter the study report no contact, and after the

17   study is undertaken and treatment is provided, and

18   there's a lot of back-up data that's provided, including

19   polygraph information from individuals willingly giving

20   those polygraphs, the number drops that didn't have

21   sexual -- that didn't claim to have any contact from

22   74 percent down to 15 percent.  And the number of victims

23   per offender increases from 1.8 -- or almost 1.9 to 13.5.

24         The point is we just don't know.  We don't

25   know, but the information that we have would indicate

1  that there is much, much more activity in terms of

2  hands-on offenders than individuals acknowledge

3  initially.

4          And then this report also focuses that -- not

5  the report but the article by Alexandra Gelber discusses

6  the true victim in the case.  We often overlook the

7  victims, and they're these children.  You know, this is

8  like the horror movie, the Chain Saw Massacre, but it

9  involved real kids.  And the kids are getting younger and

10 younger, and the violence is getting greater, and the

11 type of sadistic behavior is getting greater and greater.

12         And so we have to be careful when we say, well,

13 there's no evidence of hands-on offenses; and, therefore,

14 27 months, you know, that seemed to work the first time,

15 and maybe that's what we should do this time.

16         I know we have a minimum here, but I believe

17 you understand my argument.  The argument is these are

18 very serious offenses, and we can't overlook that.

19         MR. LYONS:  I couldn't agree with you more.  I

20 guess, I'm -- as a defense lawyer, I'm concerned that

21 there might be spill-over affect into some of these

22 factors in terms of the statistics you just cite, Judge.

23 I guess I have to deal with what I actually have in front

24 of me in terms of evidence.

25         THE COURT:  Yes, sir.

```
 1              MR. LYONS:  And I don't see a lot of that.  I
 2   recognize that that's informing the Court's judgment.
 3              In terms of seriousness of the offense, I don't
 4   disagree with a word that Your Honor just said.  Truth is
 5   for years I wouldn't even take these cases, and the
 6   reason is because I have to go -- I've got to go view the
 7   stuff in order to make sure that it is, in fact, child
 8   pornography.  And at the time I had an eight or
 9   nine-year-old daughter.  Now, she's 14, and I can barely
10   watch.  And I'm not saying anything about me.
11              What I'm saying there's apparently some part of
12   these guys's brains that operates in a way that mine does
13   not.  And I do think that it's fair to say that that's a
14   part of an illness, and I recognize that society has some
15   protection requirements as a result of that.  Whether
16   it's compulsive, whether it's free-will, whether it's
17   just I don't care what's happening to these children, I'm
18   going to look at this stuff anyway.  So I don't think
19   there's any disagreement about that.
20              The bulk of my argument, Your Honor, and I
21   think you've read it, and I think you're familiar with
22   it, but basically it's based on this 2012 report from
23   the -- from the sentencing commission itself.  And
24   basically the report draws the conclusion, as best I read
25   it, that the 2G2.3 was not -- was not promulgated in
```

1  connection with the sentencing commission's historic role

2  of looking at empirical data and looking at sentences

3  that were actually imposed.

4          THE COURT:  And neither were the drug lines.

5          MR. LYONS:  That's true.

6          THE COURT:  They're based on -- tied to

7  mandatory minimums, and there's a back off.

8          MR. LYONS:  That true.  And I stand here in the

9  position of asking Your Honor to disagree with something

10 which Your Honor might not disagree with.  But I think

11 it's important to note that when they're not based on

12 empirical evidence and not based on historical sentences,

13 why is it that so many defendants are receiving below

14 guideline sentence?  I don't believe for a second that

15 Federal Judges around the country are thinking that these

16 are not serious crimes, that the victims are not real,

17 and that this is horrendous stuff.  I don't believe that

18 for one second.

19          What I do believe is that in almost every case

20 in all of these enhancements under 2G2.2 seem to apply.

21 There's almost always more than 300 images or 600 images.

22 There's always the use of a computer.  There's always

23 pre-pubescent children.  The availability of this stuff

24 on the Internet now is not such that you have some

25 nefarious person sitting around trying to figure out how

28

1   to get his hands on this child pornography by dealing
2   with other people who are collecting child pornography.
3   It's a push of a button basically.
4           And so I think the report is basically coming
5   to the conclusion that these -- that the mine-run cases
6   here result in guideline calculations that are
7   astronomical, and that they've asked for some corrections
8   to that.  How is it that 60 percent -- and I've looked at
9   the figures, and I'm close if I'm not right on point.
10  60, 62 percent, somewhere along those.  Maybe in previous
11  years, Judge, it was slightly less, but the statistics I
12  looked at for the quarter of October '17 through March of
13  2018 show a 62 percent variance from the federal
14  judiciary.
15          THE COURT:  I have those statistics here.
16  You're including within that government-sponsored
17  motions; right?  So it's not just when the Court is going
18  off on a variance, when there's not a motion that's been
19  filed, you're including every variance in your numbers.
20          MR. LYONS:  I couldn't agree with you more.
21  And I actually asked one of my paralegals to try and
22  break out, see if I could break out some of this
23  information.  Because you and I both know that it's
24  really hard to dif -- when I'm making a disparate impact
25  argument, or there's a disparity in how these defendants

1  are sentenced, I've got to look at statistics, and I
2  don't have a lot of the background information.  I don't
3  have their criminal history.  I don't know which ones are
4  recidivist and which ones are not.  So I grant you the
5  number is a gross number.  But it still reflects the
6  judiciary coming to the conclusion that the guideline
7  ranges in these particular cases seem to be particularly
8  onerous, or else why else ask Congress to change it,
9  which is what they have done.
10         THE COURT:  And every time that happens, what's
11 the response from Congress?
12         MR. LYONS:  Well --
13         THE COURT:  It's a rejection of the suggestion
14 that the guidelines be changed --
15         MR. LYONS:  Yeah, I'm not --
16         THE COURT:  -- because Congress takes these --
17         MR. LYONS:  I'm not here to second guess
18 Congress, Judge.
19         THE COURT:  Right.
20         MR. LYONS:  I guess what I'm saying is it's a
21 directive.  The congressional directive is to the
22 sentencing commission.  It is not to Article III judges
23 who have the authority under controlling Supreme Court
24 case law to at least ameliorate a little bit some of the
25 harsh effects that typically result because -- for

1    instance, the computer.  Everybody uses a computer, and

2    yet there's a two-level enhancement.

3         THE COURT:  And yet that's already taken into

4    account in the guidelines because at the time 2G was

5    adopted, the sentencing commission specifically said

6    everyone is going to use a computer here, so we need to

7    factor this into it.  And that's actually discussed in

8    Alexandra Gelber's article I just cited a moment ago.

9         MR. LYONS:  My job is to make the argument,

10   Judge.  I sense where Your Honor is --

11        THE COURT:  Well, no, the problem is, you know,

12   and I appreciate the sentencing memo that you filed and

13   the arguments that you make.  But I have to be able to

14   address those arguments, and I don't want the Sixth

15   Circuit to think that I haven't considered the arguments.

16   And one way of doing that is to have an interchange with

17   you and discussion with you about the pros and cons of

18   some of these arguments.

19        For example, I certainly do understand and

20   appreciate that a number of judges recognize that they

21   have discretion post-Booker, Gall, and Kimbrough to vary

22   under 3553 from certain areas.  We saw that with the

23   cocaine amendments that resulted in the cocaine

24   amendments and the changes in other sections of the

25   guidelines.  But there are certain sections of the

1    guidelines, and the Sixth Circuit has recognized that are

2    not based upon empirical data.

3            Nonetheless, the Court should take the

4    guidelines into account in making that initial

5    determination.  We have to calculate the guidelines

6    properly.  We may have a policy disagreement, and Sixth

7    Circuit has upheld that where there are policy

8    disagreements, and a Judge varies downward.  But that

9    doesn't mean you have to.  It's kind of like the issue of

10   political correctness.  Just because one person thinks

11   something is politically correct, doesn't mean everybody

12   has to jump on the band wagon and use terms or phrases

13   that are the cool thing to use at the time.

14           There are some areas where we have to focus on

15   victims, and it's -- we're seeing that in some cases

16   judges haven't focused on victims.  There's a case that's

17   gone -- and I believe it's a case from Northern -- a

18   court in Northern Ohio that's gone to the Sixth Circuit

19   two or three times, because the District Judge focused

20   primarily, or almost exclusively, on the defendant in the

21   case and didn't recognize the other factors, didn't think

22   the person was likely to recidivate, and gave him a very

23   light sentence.  It was reversed and sent back for

24   resentencing.  Did it again, and the Sixth Circuit took

25   the case away, recognizing that we have to look at all of

the factors of 3553, and we have to look at -- I think we
have to consider what Congress does in these cases.
Congress's focus is that these are serious cases, and
they focus on the victims.  And in a couple of cases the
Supreme Court has acknowledged that that is the case.

          We do have to look at the victims, and that's
the reason I used the example earlier about these cases
are like horror movies, but we have children that are
real that are being victimized in these cases.  And too
often I think individuals in the defendant's position
believe that these aren't real kids, that it's a fantasy,
and they engage in these conversations online with
like-minded individuals that give support to that
concept.

          And we do have a lot of cases where we have
high guidelines where all these enhancements apply, which
is an indication of a couple of things.  One, the
government is prosecuting serious cases.  They're
bringing cases where there are lots of enhancements that
do indicate that we have a lot of victims that are being
harmed pretty significantly.  But these cases are getting
more serious, and that was the point I was trying to make
earlier in terms of the numbers, if you look at the
numbers since 2000, the number of cases that are being
brought, the seriousness of the cases, the enhancements

1  that are being applied.  The Internet makes it too easy

2  sometimes.  And just because a person, you know, we go

3  from one defendant in the district one year to let's say

4  100 the next year with all these enhancements, that

5  doesn't mean that the guidelines aren't working.  That

6  just means that a lot of people are being prosecuted, and

7  a lot of victims are out there.

8        And, you know, I -- I look at some of these

9  letters in these cases from parents of these children.

10  Let me just read a quote to you.  This is from the

11  article that's in entitled Response to a Reluctant

12  Rebellion.  "We have no way of knowing how many

13  pedophiles used the pictures of her to be -- of her being

14  tortured and degraded as an opportunity for personal

15  gratification.

16        "I struggle with anger at the unbounded nature

17  of this continuing exploitation and the arrogant

18  callousness of those who perpetrate it.

19        "If I had my way, each and every image of my

20  daughter's sufferings would be burned.  Then she would no

21  longer have to worry about those images being used to

22  further hurt or humiliate her.  But as it is, there are

23  those who have no shred of decency, and continue to copy

24  and pass on these pictures.

25        "I can find no words to express the fury I feel

1    at those who participate in this evil, or my scorn for

2    any attempt to minimize the responsibility by feeble

3    claims that the crime was victimless.  My daughter is a

4    real person.  She was horribly victimized to provide this

5    source of entertainment.  She's exploited anew each and

6    every time an image of her suffering is copied, traded,

7    or sold.  While the crime is clearly conscienceless, it's

8    hardly victimless.

9          "I asked my daughter what she most wanted to

10   ask of the Judge.  Her request was, please, don't let

11   them pretend that no one is getting hurt.

12          So I do consider the victims in these cases,

13   but the other issue that I consider when an argument is

14   made this was a result of an illness, the question

15   becomes is this an illness that could result in this

16   offense reoccurring?  And if we have an individual that

17   has a pattern of mental health issues and if he -- if

18   this occurred in 2001, there was a period in which it

19   didn't occur, it occurs again, what's to say that it

20   would not occur again when he is released from whatever

21   term of imprisonment the Court imposes?  If the illness

22   created the problem, the first problem, reoccurring

23   problem, it's still there.  So is it a mitigating factor,

24   or is it an aggravating factor?

25          MR. LYONS:  I take it the Court thinks that

1    it's very likely an aggravating factor, at least in some

2    way.

3            Judge, I'm not suggesting -- and maybe I'm not

4    articulating myself well.  I'm not suggesting that this

5    is a victimless crime.  I don't believe that for one

6    second.

7            THE COURT:  No, and you actually acknowledge

8    that, I believe, on maybe page 18 of your 19-page memo.

9            MR. LYONS:  Yeah.  Well, I can't get around the

10   fact that this is a horrible crime with real people and

11   real children.  I think -- I think these are the most

12   difficult cases possible.  I guess the question is where

13   does the pendulum swing?  If the Court's concern is that

14   federal judges have focused too much on the defendant and

15   their plight, should we focus completely on the victim

16   and their plight?  I understand that --

17           THE COURT:  No, I don't think we can ignore

18   either one.

19           MR. LYONS:  Well, I agree with that.

20           THE COURT:  But your point was --

21           MR. LYONS:  I agree with that.

22           THE COURT:  But your point earlier was we have

23   all these judges that are varying greatly below the

24   guidelines.  There has to be a reason for that.  Part of

25   the reason may be that perhaps we're focusing, or some

1   judges are focusing, not on all of the issues in the

2   case.  We don't know.  We don't know that.

3          I do know, and I can tell you, that in terms of

4   variances there are variances that are departures, there

5   are variances that are sponsored by the government, and

6   there are variances that are sponsored by defendants that

7   are filing the motions over the government's objections.

8   And so we have a lot of different reasons.  We have

9   defendants that some that don't have any criminal history

10  whatsoever, which is not unusual --

11         MR. LYONS:  No.

12         THE COURT:  -- in these offenses.  And some

13  Courts look at that and see that as an aberrant behavior

14  in a particular case.  And maybe it is, and maybe it's

15  not.  We can't tell that because we don't have the

16  reports, and we can't say that the reports tell the full

17  story.

18         MR. LYONS:  I agree.  And I certainly think I

19  would be sitting here in a much better position arguing

20  on behalf of my client if this was the first time

21  offense -- first time offense.

22         Let me say a few more things.

23         THE COURT:  Yes, sir.

24         MR. LYONS:  Just one point about

25  government-sponsored departures.  I hear what the Court

1  is saying.  I've never seen one.  These are not cases

2  where there's co-defendants typically where somebody is

3  going to testify against somebody else, so there's not a

4  lot of 5K1.1 motions as best I know from my experience in

5  these kinds of cases.

6          The question is if the guidelines are here to

7  promote uniformity, and the guideline is drafted in a way

8  that doesn't take that particular issue into account;

9  that is, they're moving toward the direction of what a

10 congressional body has told them to do, and obviously

11 they have the authority to do that.  But that undermines

12 sort of one of the basic underpinnings of the guidelines,

13 which, of course, are advisory.  I don't have a good

14 explanation for the number of departures.  I just know

15 that statistically they exist.  Statistically they do

16 exist.

17          So how do I address the Court's concerns that

18 the Court has raised and articulated here?  I've asked

19 for a sentence of 180 months.  Mr. Pendygraft is 46 years

20 old.  Granted, I've asked for the minimum under the

21 statute.  By the time he gets out of prison, he'll be

22 61 years old if the Court gives him a slightly higher

23 sentence than 15 years.  He's going to be in his early

24 60s.  I'm not going to make the argument that because his

25 age is increasing recidivism is less likely to occur.  I

1  think the facts dictate otherwise as the Court has noted.

2         What I do think is there's a way to protect

3  society, protect victims, potential victims down the

4  road, by fashioning a sentence that's slightly different.

5         For instance, if the Court were to sentence him

6  to 15, 16, 17 years in prison, he's gotten into his early

7  60s.  The Court can impose 20, a lifetime term of

8  supervised release where he can be extremely monitored,

9  is subject to search, subject to computer looking at his

10 activities.

11        A sentence in the guideline range, even at the

12 bottom of the guideline range, is essentially a life

13 sentence for this gentleman, and it may be appropriate.

14 It may.  But it's essentially a life sentence for this

15 guy.

16        Is this a case that deserves life sentence?

17 Statute doesn't talk about that.  I've certainly stood in

18 front of people who have gotten life sentences when they

19 took somebody else's life.  The horrendousness of the

20 crime here maybe it is parallel to the kind of conduct

21 that would result in the taking of someone's life.  Maybe

22 it is, analytically speaking, but I don't think it is.

23        If I look at his criminal history and I look at

24 the fact that he's in category V when at least four of

25 the points are for technical violations for the sex

1  registry, when I look at the fact that he's got a

2  three-point conviction for felon in possession, which

3  easily could have been picked up by the federal

4  government, he might even be a -- he might even be a

5  category II.

6        So I do think that his criminal history

7  over-represents his criminality.  I'm not -- I'm not

8  minimizing for a second his previous conviction and the

9  possibility that he will recidivate.  I think that's a

10 distinct possibility as the Court has pointed out.  I

11 don't think I could take any other position and stand

12 here and be reasonable in front of Your Honor.

13       I just don't know how to explain what this

14 illness is.  I don't have it.  You know, when my mind --

15 when I'm over at the lab in Frankfort, and they begin to

16 show me this stuff, there's something that happens to me

17 that's really ugly that apparently doesn't happen in

18 Mr. Pendygraft, and I don't know what that is.  I don't

19 know if it can actually be ameliorated.  I don't have

20 enough information to know that.

21       But what I do know is he has engaged in conduct

22 at a time in his life where he was at his lowest ebb,

23 ready to commit suicide and leave this planet because

24 everything worthwhile in his life he perceived to be

25 taken away from him, and so engages one more time

1    revictimizing these people.  And I don't have any doubt

2    that they're revictimized when they are shown again.

3            I do think, Judge, even if my -- even if my

4    suggestion of 180 months is unreasonable -- now the

5    sentence below 290 to -- might not be reasonable and

6    still meet the purposes of 3553(a).

7            And I think the Court can fashion a term of

8    supervised release that will protect the public, and I

9    recognize that public requires protection here, and would

10   constitute a just punishment.

11           Just one other thing about what I saw in the

12   government's response.  It's interesting to me that,

13   although the United States takes the position that they

14   understand that we're supposed to look at this on a

15   national level, difficult as it is to ferret out that

16   information and analyze it, if you actually look at the

17   11 cases that are cited in this particular judicial

18   district, and you average out what the sentences are in

19   those 11 cases that did not go to trial, the average

20   sentence is 133 months.

21           Again, I don't have -- I may very well be

22   comparing apples to oranges, and I recognize that.

23           THE COURT:  Well, we don't have the ranges, do

24   we?

25           MR. LYONS:  We don't have it.

1            THE COURT:  We don't have the average ranges,
2  so it's --
3            MR. LYONS:  And I've heard Your Honor talk
4  about this before where I can't be making arguments where
5  I don't have the full facts in front of me so I can
6  actually say these are defendants in like circumstances
7  with the same criminal history.  I think that's
8  appropriate.  Maybe I'll get more sophisticated about my
9  statistical analysis in the future and figure out how to
10 do -- how to make that argument.
11           With regard to a fine, the defendant doesn't
12 have the ability to pay a fine.  I know the Court
13 certainly will consider that and will impose a fine that
14 it thinks is appropriate.
15           I do think the defendant requires mental health
16 treatment.  He does not appear to have an alcohol or drug
17 abuse issue, at least as far as the evidence indicates.
18 And so those are -- I don't know that those are actually
19 required, but he does require mental health counseling.
20           I would ask the Court to consider the facts
21 that he has got this three-year sentence in the
22 Boyle Circuit Court.
23           I would ask the Court to give him time -- give
24 him credit for the time that he has spent in federal
25 custody, which is about 12 months now.  If I look at the

1  time from the time that the writ was issued and he was

2  brought over here to federal court, and the time of his

3  sentencing, he's been sitting at the Grayson County

4  Detention Center for about 11 plus months.

5        So I would ask the Court to adjust the sentence

6  under 5G1.3 with the Court's plenary authority to do

7  that, whether it's relevant conduct or not.  And I would

8  ask the Court to take that into account and adjust the

9  sentence accordingly.

10        I would also ask the Court to run whatever

11  federal sentence is imposed here today concurrent with

12  the sentence that was imposed in the Boyle Circuit Court

13  case, case number is listed in the paragraph.

14        And I guess the last thing I want to mention is

15  I don't have any -- any letters of support from his

16  family.  He's mortified to even contact his family.  I'm

17  frankly not sure, Judge, as I sit here in front of you --

18  as I stand here in front of you today, that his ex-wife

19  and his two children know he's being sentenced today,

20  which I find terribly sad.  Not as sad as what happened

21  to these victims, but sad nonetheless.  I assume they

22  love him, but I don't know -- I don't know that they

23  actually have had any involvement in terms of providing

24  support.

25        So I've asked the Court for a sentence of

1    imprisonment of 180 months.

2            I guess -- I guess the real argument I'm making

3    is for something significantly less than the 292, at the

4    bottom end of the guideline range.  I still think that

5    that would still promote respect for the law, be a just

6    punishment, and would deter others.  I haven't gotten a

7    lot into the deterrence issue.  I'm not going to.  I

8    think I've cited some information in my sentencing

9    memorandum with regard to deterrence and whether these

10   types of sentences actually deter this particular

11   defendant.  Certainly a lengthy sentence is going to

12   deter him individually, so I recognize that, but whether

13   there's a general deterrent affect from a sentence of

14   30 years as opposed to 17 years, or 28 years as opposed

15   to, you know, 20 years.

16           And I think that's all I had to share with

17   Your Honor.

18           THE COURT:  All right.  Thank you.

19           Mr. Pendygraft, would you like to add anything

20   to what Mr. Lyons has said on your behalf?

21           DEFENDANT PENDYGRAFT:  No, sir, other than I'm

22   sorry, and I realize that I relapsed into something that

23   I thought was far behind me.

24           THE COURT:  All right.

25           DEFENDANT PENDYGRAFT:  I guess that's all.

44

1               THE COURT:  All right.  All right.  Thank you.
2          Mr. Marye.
3               MR. MARYE:  Your Honor, just a couple of
4     things.  When Mr. Lyons addressed the pedophilic disorder
5     prognosis there, or diagnosis, in the psychological
6     evaluation, I dug it out to look at it again, and I had
7     actually put a question mark by that when I first saw it
8     because I was wondering what the basis of that was, and I
9     was wondering if he had made statements that, you know,
10    he had actually had a contact offense, and did not find
11    anything in there looking at that.  And it was basically
12    associated with the type of offense behavior for which he
13    had been charged.  Because I was certainly curious to see
14    if there was anything in which he had ever admitted to a
15    contact offense, and did not appear to me that there was
16    anything in that psychological evaluation.
17              THE COURT:  Well, it's certainly not listed in
18    the report, but the report does not list all of the
19    questions and answers that take place during their
20    evaluation, does it?
21              MR. MARYE:  No, sir, absolutely not, and I did
22    not follow up or inquire of the evaluator.
23              THE COURT:  All right.
24              MR. MARYE:  And, of course, one thing in my
25    mind at that time that was significant is that even if

1   one has this pedophilic disorder, that does not cause an

2   unknown deficit in their capacity to reason or to conform

3   their behavior to that which is required by law.  So, in

4   other words, he did not have an insanity defense which

5   was my main focus at that time.

6          And then I -- in just looking at Title --

7   Title 18, Section 3553, the two, which the sentencing

8   guideline you referred to, then refers back to in

9   sentencing a person in these types of offenses, shall

10  impose a sentence of the kind and within the range

11  referred to in the guidelines, unless you find an

12  aggravating circumstance of a kind or to a degree not

13  taking -- adequately taken into consideration by the

14  sentencing commission in formulating the guidelines.

15         And -- or, secondly, that there exists a

16  mitigating circumstance to a degree that has been

17  affirmatively, specifically identified as a permissible

18  ground of departure, and has not been taken into

19  consideration by the commission in formulating the

20  guidelines and should result in a sentence different than

21  that described in the guidelines.

22         I'm not certain that I have seen or heard

23  anything that really fits that, that there should be any

24  other reason to go below the guides.

25         The United States certainly is satisfied, as I

1  said in the sentencing memorandum, with a sentence at the

2  bottom end of the guideline range.  That is a significant

3  sentence.

4       And as Mr. Lyons seemed to allude to, whatever

5  sentence the Court imposes, the United States would ask

6  the Court to strongly consider a life term of supervised

7  release.  Because, as you pointed out, if he's had this

8  mental health issue and that had anything to do with his

9  first offense and then again now this offense, then

10  there's no guarantee really that that won't occur.

11       Thank you, Judge.

12       THE COURT:  Okay.

13       MR. MARYE:  Oh, I'm sorry, Judge.  I forgot

14  also.  Also my practice is to try to get criminal defense

15  attorneys in touch with victim's attorneys who claim

16  restitution or ask for restitution to see if they can

17  work out an agreement.  And in this particular case based

18  on the defendant's resources, or lack of resources, and

19  my communication with the victim's attorney who had

20  sought restitution, she has chosen to withdraw her

21  request in this case.

22       And then finally, Judge, also I think I would

23  ask the Court to make sure to make the finding that this

24  is a case that if he's indigent, then the 5,000 mandatory

25  special assessment under Title 18, Section 3014, is not

1   applicable, but the Court must make that finding that he
2   is indigent, and I don't think that would be a problem
3   for the Court to make.

4           Thank you, Judge.

5           THE COURT:  All right.  All right.  Thank you.

6           Well, there are quite a few issues to be
7   discussed, attempted to do some of that in my questions
8   with counsel, but I do want to go back.

9           I do consider all of the arguments that have
10  been made, both those orally, as well as those through
11  the memos that have been filed in the case.

12          The Court begins the analysis from the properly
13  calculated guideline range.  The Sixth Circuit has
14  affirmed several cases in which it clearly states that
15  the guidelines are the starting point.  I've had cases
16  that have been appealed because I generally will say that
17  my starting point for going to be logical is the middle
18  of the range.  Some folks take offense to that and
19  appeal, but the Sixth Circuit has affirmed that the
20  guidelines are the starting point, and that is a logical
21  place to start.

22          But the guidelines are not binding.  We do have
23  a minimum term to be imposed here, but the guideline
24  range is significantly above the mandatory minimum, the
25  15-year term.  The bottom of the range is 292 months.

48

1            The United States indicates that, I believe, a

2    sentence at that point would be an appropriate sentence

3    and would satisfy all of the factors of 3553.

4            The defendant argues that the Court may and

5    should impose a much lower sentence taking into account

6    all of the 3553 factors that do include nature of the

7    defendant's criminal history and the argument that can't

8    be made under the guidelines, but can be made under 3553,

9    that criminal history is somewhat overstated.

10           And the sentencing memo then also expands upon

11   the defendant's history and characteristics, includes

12   some information from the psychological evaluation that

13   was performed at the parties' request, a lot of

14   background information, and then discusses the nature and

15   circumstances of the offense, and focuses in large part

16   on the issue of -- that we've been discussing here, which

17   has been the fact that the guidelines, the argument that

18   the guidelines for these particular offenses in 2G are

19   not empirically based.

20           With regard to that issue, there's been quite a

21   bit of discussion of that particular issue and the number

22   of cases, including cases from the Sixth Circuit.  And

23   the Sixth Circuit has explained in some detail that while

24   Courts may use that as a basis to vary a disagreement, a

25   policy disagreement, with that particular provision of

1   the guidelines and the lack of empirical data, that it

2   does not require Courts to vary below the guidelines.

3              And I'll just point out a couple of decisions

4   from the Sixth Circuit.  Kirchoff being one.  I think it

5   was Judge Gibbons case in 2007.  So this is just shortly

6   after Booker when this issue arose.  It's 505 Fed 3d,

7   409.

8              And then there's an unpublished decision, which

9   I think may be helpful.  It's Staton, 435 Federal

10  Appendix 422, which is a 2011 case.

11             And then, of course, we have the Bistline case

12  as well from 2012 I believe.  It was -- I believe that

13  was Judge Kethledge that authored that particular

14  opinion.  That discusses these arguments about these

15  provisions of the guidelines and discusses Congress role

16  in establishing penalties, but also acknowledges that

17  Courts may use that as a basis for departure.

18             And we've also discussed some of the

19  statistical information about variances, and this is an

20  area, these particular offenses would be one area where

21  Courts are less likely to apply a guideline sentence.

22             Another area would be career offender

23  provisions, where there's quite a bit of disagreement

24  about those particular provisions and attempts to make

25  modifications.

1          But, again, just because the Court may vary

2     doesn't mean that the Court must vary.  And in some

3     situations the Court may disagree with the majority or

4     wave of Courts that believe that there should be

5     variances in these cases.

6          As I've attempted to indicate through my

7     questions and through some of the authorities that I have

8     cited, I do believe that there is a very legitimate

9     reason for having a high guideline range in a case such

10    as this where we have a number of factors, very

11    aggravating factors.  Because oftentimes I think we

12    ignore victims in these matters, the true victims.

13         And Supreme Court has indicated in Ferber and

14    other cases that Congress certainly is within its right

15    to establish high penalties in these cases in an attempt

16    to drive the supply, to impose high sentences and

17    hopefully drive the supply for -- for these individuals.

18    But there continues to be a harm that occurs in these

19    cases unfortunately.

20         I don't agree with those judges that believe

21    that we should vary from the guidelines just as knee jerk

22    reaction, a reflexive reaction in these cases.  I do look

23    at the enhancements, the individual enhancements that are

24    applied.

25         Computers are often used in these cases, but as

1    I indicated in my comment, that is taken into account

2    with the guidelines.

3              In this particular case when I look at the

4    other factors of 3553 that come into play, we look first

5    at the nature and circumstances of the offense, which as

6    I've indicated, is quite serious, and the history and

7    characteristics of the defendant.

8              I pointed out some of those characteristics

9    because it goes to a couple of points.  It goes to the

10   sentence and likelihood of recidivism, and it also goes

11   to rehabilitative services that I believe need to be

12   provided to the defendant.

13             The ultimate sentence in this case will include

14   recommendations with respect to treatment.  Probably

15   that's the most important part of this sentence in this

16   case.  We focus quite a bit on the length of the

17   sentence, but I believe in this particular matter

18   treatment is very, very important, and it will be a key

19   component of the Court's sentence.

20             Also, I do agree that a life period of

21   supervision is appropriate in this particular matter

22   because that will also provide a degree of protection to

23   the public and will allow the defendant to continue to

24   receive services if they do become appropriate in the

25   future.

1            Deterrence.  Deterrence is an important factor

2    for two reasons; specific deterrence for this defendant

3    but general deterrence for others that might be inclined

4    to commit a similar offense.

5            I have probably talked a little too much about

6    some of the -- some of the information in a couple of the

7    articles that I've pointed out to the attorneys.  But the

8    information in those articles undercuts a number of

9    arguments that are typically made in these cases, and it

10   addresses, again, the seriousness of the offense and also

11   the true victims in these matters.

12           I have talked about the issue of mental health.

13   I will certainly address that through the sentence with

14   rehabilitative services.

15           I talked a little bit about the defendant's

16   criminal history.  I do not believe that it's overstated

17   for purposes of an argument that would support a

18   variance.  The defendant has the earlier conviction, but

19   then he's had other problems since that time, and that

20   has resulted in criminal history points being assessed to

21   him, properly assessed to him.  So I don't think that his

22   mental -- excuse me, his criminal history is overstated.

23           What I have decided to do in this particular

24   case based on all the arguments that have been made is I

25   am going to impose a sentence at the bottom of the

1  guideline range in this particular matter, but I am going
2  to run the sentence concurrent with the state sentence.
3  So I am -- he will effectively get credit for that
4  service of that matter.
5          And I believe that that may -- well, I'll also
6  note in the judgment that he'll receive credit for the
7  time that he has spent in federal custody, but, again,
8  he'll get -- the sentence will be concurrent with the
9  state sentence.  So he'll get credit for the time that
10 he's spent on that state sentence, in addition to the
11 federal time.  So he'll get credit for that -- for that
12 time.
13         I don't believe, however, that it would be
14 appropriate under the facts presented here to impose a
15 sentence below the guideline range.  Again, it's my
16 opinion that too often Courts will overlook the true
17 victims in these cases, and there are many victims, and
18 they suffer very serious injuries that are recurring as
19 I've attempted to highlight by the section that I
20 wrote -- that I read here just a moment ago.
21         I could provide the parties with some anecdotal
22 evidence with offenders re-offending and the need to have
23 supervision regardless of the defendant's age.  And I'll
24 just state that I do have individuals that are up in
25 years that continue to commit offenses while they're on

1    supervision and feel like they have the ability to do

2    that under the First Amendment.

3            A gentleman in Covington now who continues to

4    violate when he's released and believes that he will --

5    should be able to do that with some impunity.

6            So age is not really a factor here in terms of

7    the need for supervision, and I do believe that

8    supervision is needed based upon information in the

9    presentence report, as well as the mental health

10   evaluation, supervision is needed for a -- for a term of

11   life.

12           I accept the defendant's statement of remorse,

13   and the other mitigating factors that have been argued by

14   counsel effectively in terms of the defendant's depressed

15   mood.  I do accept those arguments, and that is the

16   reason that I have crafted a sentence that will provide

17   him with some credit.  While it's a guideline sentence,

18   it will provide him some credit in terms of it running

19   concurrently with the state sentence, and also providing

20   him with some rehabilitative services as well.

21           Let me announce the sentence.  It will be the

22   sentence of the Court pursuant to the Sentencing Reform

23   Act of 1984, as modified by the decisions in Booker and

24   Fanfan, and I do find that the following sentence would

25   be sufficient but not greater than necessary to meet the

1   purposes of Title 18, Section 3553(a).

2          And, therefore, it will be the judgment of the

3   Court that the defendant, Gene Paul Pendygraft, will be

4   committed to the custody of the Bureau of Prisons for a

5   term of 292 months, to run concurrently with the sentence

6   that's imposed by the Boyle Circuit Court, Case Number

7   17-CR-28.

8          It will be recommended to the Bureau of Prisons

9   that the defendant participate in the sex offender

10  treatment program, and I will recommend that he be placed

11  in the facility in Butner, North Carolina, which I

12  believe has the ability to provide the services that are

13  needed in this particular matter.

14         I'm also going to recommend that he participate

15  in a mental health treatment program, which is also

16  available at that facility.

17         Upon release, he will be placed upon

18  supervision for a term of life.

19         And within 72 hours of release from the custody

20  of the Bureau of Prisons, he must report to the probation

21  office in the district in which he is released.

22         While on supervised release, he may not commit

23  another federal, state, or local crime.

24         He must comply with the mandatory and the

25  standard conditions that will be set forth in the

1  judgment and the commitment order and that have been

2  adopted by the Court.

3          And he must comply with the following

4  conditions.  And they include that he not possess a

5  firearm, destructive device, ammunition, or a dangerous

6  weapon.

7          He must submit to one drug test within 15 days

8  of release and at least two periodic drug tests

9  thereafter.

10          Special conditions include that he abstain from

11  use of alcohol.

12          He must not purchase, possess, use, distribute,

13  or administer any controlled substance, or paraphernalia,

14  related to controlled substances, except prescribed by a

15  physician.

16          And he must not frequent places where

17  controlled substances are illegally sold, used,

18  distributed, or administered.

19          He must refrain from obstructing or attempting

20  to obstruct or tamper in any fashion with the efficiency

21  and accuracy of any substance abuse testing that is

22  required as a condition of release.

23          And he must not open any new credit charges or

24  open additional lines of credit without the approval of

25  the probation office.

1          Now, I will advise the parties that I am going

2    to -- that I'm imposing this condition on charges, or

3    opening additional lines of credit, because I want to --

4    for the probation office to have the ability to ensure

5    that he's not purchasing matters on the Internet or

6    otherwise that he should not purchase.

7          But I'm not going to impose a fine in the case.

8          And I am -- I will make a finding that the

9    defendant is essentially destitute and does not have the

10   ability to pay what would otherwise be required as a

11   special assessment in the matter.

12         But I am going to require that he not incur any

13   new credit charges or open additional lines of credit

14   without approval of the probation office.

15         He will be required to participate in a program

16   of treatment of mental health or sexual disorders and

17   must undergo a sex offender risk assessment,

18   psycho-sexual evaluation, and other evaluation as needed.

19         He will be subject to periodic polygraph

20   examinations and computer voice-stress analysis testing

21   at the discretion and direction of the probation office.

22         And he must follow the rules and regulations of

23   the sex offender treatment program as implemented by the

24   probation office.  They will provide additional

25   protection to the public by requiring the defendant to

58

1    participate in such programs.

2              His residence and employment will be -- must be

3    preapproved by the probation office and in compliance

4    with state and local law.

5              There will be restriction on contact with

6    minors.  He'll not be able to frequent, volunteer, or

7    work at places where children under the age of 18

8    congregate.  That would include, for example,

9    playgrounds, parks, daycare centers, public swimming

10   pools, video centers -- excuse me, youth centers and

11   video arcade facilities unless it's approved in advance

12   by the probation office.

13             And he may not have any contact with victims.

14             As counsel indicated, there is no request for

15   restitution by victims in the case, and, therefore, none

16   will be awarded.

17             He may not associate or have verbal, written,

18   telephonic, or electronic communication with any person

19   under the age of 18 without the permission of the

20   probation office.  This does not include persons under

21   the age of 18, such as ticket vendors, cashiers, waiters,

22   or waitresses and the like who he must deal in order to

23   obtain ordinary or usual commercial services.

24             He may not possess, view, listen to, or go to

25   locations where any form of pornography,

59

sexually-stimulating performances or sexually-oriented

material, items, or services are available.

And the Court imposes this restriction in light

of the fact that this is not the defendant's first

violation, that he has committed more than one similar

violation.

He may not possess or use a device capable of

creating pictures or videos without the approval of the

probation office.

I will advise the probation office that he may

have access to a smartphone, but it needs to be -- the

probation office needs to be able to review that phone

from time to time.  So that will be an exception that I

will include.

He must not rent or use a post office box or

storage facility without the approval of the probation

office, and he must register as a sex offender as

prescribed by state law.

For computer restrictions they include that he

not possess or use a computer or any device with access

to any online computer service at any location, including

place of employment, without the prior written approval

of the probation office.  And this would include any

Internet service provider, bulletin board system, or

other public or private network or email system.

1          And he must consent to the probation office

2    conducting unannounced examinations of his computer

3    system, including any internal or external storage

4    devices, which may include retrieval and copying of all

5    memory from the hardware and software and the removal of

6    such systems for the purpose of conducting a more

7    thorough inspection.

8          And he must also consent to have installed on

9    his computer any hardware or software to monitor his

10   computer usage or to prevent access to particular

11   materials.

12         And he must consent to periodic inspections of

13   any installed hardware and software to ensure that it's

14   functioning property.

15         He must also provide the probation office with

16   access to accurate information about his entire computer

17   system, including the hardware and the software and any

18   internal or external storage devices, including all

19   passwords used by him.

20         And he must abide by the rules of the computer

21   restriction and monitoring program adopted in the

22   district.

23         I will include a search condition.  He'll be

24   required to submit his person, property, home, residence,

25   vehicle, papers, computers, as that term is defined by

 1    Title 18, Section 1030(e)(1), but it includes other

 2    electronic communication or data storage devices or

 3    media, or any office to a search conducted by the

 4    probation office.

 5         The failure to submit to a search would be

 6    grounds for revocation of supervision.

 7         And he must warn all occupants that the

 8    premises would be subject to a search pursuant to that

 9    condition.

10         He must provide the probation office with

11    access to any requested financial information.

12         And, again, this condition is intended as a

13    means to allow the probation office to monitor purchases

14    of electronic and peripheral devices, as well as any

15    Internet service subscribed to or access by the

16    defendant.

17         As I've indicated, based on his current

18    financial situation, I will waive the fine requirement in

19    the case.

20         He will, however, be required to pay the

21    special assessment of $100, and that will be due

22    immediately.

23         The Court does not impose restitution in the

24    matter for the reasons previously stated.

25         And that will be the judgment of the Court.

1           Let me take a look at the plea agreement.

2           In paragraph 8 the defendant retained the right

3  to appeal the sentence, and so in just a moment, I will

4  ask the clerk to advise Mr. Pendygraft of his appellate

5  rights.

6           Before I do that, I will entertain any

7  objections that the parties may have to the sentence and

8  conditions of supervision; second, any objections under

9  United States versus Bostic.  Under that decision from

10 the Sixth Circuit any objections not previously raised

11 should be raised at this time so that they may be

12 addressed by the Court to be properly preserved for

13 review on appeal.

14          And finally, if the parties would like the

15 Court to make additional findings to support the sentence

16 that has been announced, I will do so upon request.

17          Mr. Marye.

18          MR. MARYE:  Your Honor, no objections to the

19 sentence, nor under Bostic, and no request for further

20 findings, other than to ask the Court to be sure to

21 include in the judgment the forfeiture.  You've already

22 entered docket entry 37 on July 3rd, which was the

23 forfeiture order, but I seem to recall guidance from our

24 civil division that we're supposed to ask that it also be

25 in the final judgment.

1             THE COURT:  All right.

2             MR. MARYE:  Thank you, sir.

3             THE COURT:  Yes, sir.

4             Mr. Lyons?

5             MR. LYONS:  Just ticking through my head, I

6  think the Court has addressed all of the issues that I

7  raised.  So I'm not asking for any additional factual

8  findings, do not have any objections under Bostic, and do

9  not otherwise object to the sentence other than as

10  previously argued.

11             THE COURT:  All right.  Thank you.

12             Madam Clerk, if you would please advise

13  Mr. Pendygraft of his appellate rights.

14             THE CLERK:  Yes, Your Honor.

15             You're notified by this Court that you have a

16  right to appeal your case to the Sixth Circuit Court of

17  Appeals, which on proper appeal will review this case and

18  determine that there has or has not been an error of law.

19             However, a defendant may waive those rights as

20  part of a plea agreement, and you have entered into a

21  plea agreement, which waives some or all of your rights

22  to appeal the conviction.  Such waivers are generally

23  enforceable, but if you believe the waiver is

24  unenforceable, you can present that theory to the

25  appellate court.

1          If you are unable to pay for the cost of the

2    appeal, you have a right to apply for leave to appeal

3    in forma pauperis, which means you may appeal without

4    paying for it.

5          If you are without the services of an attorney

6    and desire to appeal, upon request, the clerk of this

7    Court shall prepare and file forthwith a notice of appeal

8    on your behalf.

9          With few exceptions, this notice of appeal must

10   be filed within 14 days from the date of entry of this

11   judgment.

12         If you do not have sufficient funds to employ

13   an attorney, the Court of Appeals may appoint your

14   present attorney, or another, to prosecute the appeal for

15   you.

16         You may request to be released on a reasonable

17   bond pending the appeal.

18         THE COURT:  All right.  Thank you.

19         Mr. Pendygraft, you're about to be handed what

20   was just read.  Please take a moment to review your

21   appellate rights with counsel.  And after you've assured

22   yourself you understand those rights, if you could sign

23   the original document, and there's a copy you can keep

24   for your records.

25         (Whereupon, Defendant Gene Paul Pendygraft signs the

```
 1   form.)

 2              THE COURT:  All right.  Thank you.

 3              If there are no other issues to be taken up,

 4   we're going to take about a five-minute recess before the

 5   next matter is called.

 6              The 11 o'clock matter we'll call at 11:30.

 7              Thank you.

 8       (Whereupon, the Sentencing Hearing Proceedings

 9   concluded at 11:25 a.m.)

10                   C E R T I F I C A T E

11       I, Peggy W. Weber, certify that the foregoing is a

12   correct transcript from the record of proceedings in the

13   above-entitled matter.

14

15
     October 2, 2018                s/Peggy W. Weber
16      DATE                        PEGGY W. WEBER, RPR

17

18

19

20

21

22

23

24

25
```